ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

      v.

PRESTON HOPPER, TAMELA PALLAS, and
TERRY WOOLLEY,

            Defendants.

**H 04 -1054**

COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.    This case involves improprieties arising from immense "round-trip" energy trades conducted in 2000 and 2001 through CMS Marketing Services & Trading ("MS&T," a subsidiary of CMS Energy Corp. ("CMS") that was formerly engaged in wholesale energy marketing.[2]   Defendant Tamela Pallas, then MS&T's chief executive, orchestrated the round-trip-trading scheme.   Defendant Preston Hopper, then CMS's chief accounting officer, sponsored improper accounting for the sham transactions and, when CMS's outside auditors forced a change in accounting methodology, fraudulently failed to disclose the reasons for the change.

2.    The round-trip trades were massive, pre-arranged transactions involving simultaneous purchases and sales of electric power or natural gas, between the same

---

[2]    Round-trip trades have been referred to variously as "Brag-a-Watts," "volumetric" deals, "wash" trades, "net-zero" trades and "zero-margin" trades.  The term "round-trip" will be used in this Complaint.

counterparties, for the same volume, at the same price, with no contemplation of delivery and no possibility of profit for either party. Pallas directed that Houston-based MS&T conduct the trades.

3.      Throughout the period of round-trip trading, CMS included its artificially inflated revenue and trading volume in filings with the Commission, press releases, earnings conference calls and investor presentations. By reflecting the results of the trades in its financial statements, CMS overstated its revenue by a total of $5.2 billion over five quarters: $1.0 billion, or approximately 20%, for the last two quarters of 2000, and $4.2 billion, or 36%, for the first three quarters of 2001. Likewise, CMS overstated MS&T's reported energy-trading volume by a staggering 78% over the last two quarters of 2000 and 72% over the first three quarters of 2001.

4.      MS&T's round-trip trades had no economic substance and no impact on net income. Their purpose was to elevate MS&T, promoted as a CMS growth division, into the "Top 20" in industry publication volume rankings – by inflating the division's apparent trading activity. Pallas orchestrated the round-trip trading scheme, in the hope that a Top 20 ranking, however achieved, would attract more business.

5.      In addition to inflated trading volumes, the bogus trades resulted in improper revenue recognition, due to CMS's accounting treatment of the trades. In fact, CMS's artificially inflated revenue catapulted CMS from number 287 in the 1999 Fortune 500 list – which is based on revenues – to number 156 in 2001. Hopper – CMS's chief accounting officer – and MS&T's controller improperly recorded revenue from the sham transactions. Hopper also improperly caused the revenue to be reported in CMS's Commission filings and earnings releases.

6.     In early 2002, while performing the CMS annual audit in connection with the company's 2001 Form 10-K, CMS's then-outside auditor, Arthur Andersen LLP ("Andersen"), required CMS to reclassify revenues and expenses from the round-trip trades and record them on a net, rather than gross, basis – thereby eliminating their impact on CMS's financial statements.

7.     Although CMS reclassified the revenues and expenses in the 2001 Form 10-K, it did not disclose the relevant details of the trades; nor did CMS expressly disclose the magnitude ($4.2 billion) of the revenue it eliminated from its financial statements.  It was not until two months later, when the round-trip trades became the subject of the Commission's inquiry and negative media attention, that CMS finally disclosed the critical details of the reclassification.  Hopper was responsible for CMS's failure to disclose those details in CMS's 2001 Form 10-K.

8.     The Commission, in the interest of protecting the public from such fraudulent activities, brings this civil securities law enforcement action seeking a permanent injunction against Hopper and Pallas, enjoining them from further violations of the antifraud provisions of the federal securities laws, barring them from serving as officers or directors of any public company, disgorgement of ill-gotten gains, plus prejudgment interest and civil monetary penalties as allowed by law.  The Commission further seeks an order requiring Woolley to pay a civil monetary penalty of $25,000.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(e) and 78aa].

10.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

11.     Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of the acts and transactions described herein took place in Houston, Texas.

## DEFENDANTS

12.     **Preston D. Hopper**, age 52, of Northville, Michigan, is a CPA licensed in Michigan.  Hopper, who was CMS's chief accounting officer ("CAO") during the relevant period, was responsible for CMS's financial accounting and financial reporting.  Hopper is no longer a CMS officer; he currently holds a non-accounting position within CMS.

13.     **Tamela C. Pallas**, age 45, of Houston, Texas, was COO and, later, CEO of MS&T during the relevant period.  Regardless of title, at all times Pallas was MS&T's most senior executive.  Pallas resigned under pressure when the round-trip-trading scandal broke in May 2002 and is currently unemployed.

14.     **Terry Woolley**, age 56, of Houston, Texas, was MS&T's controller from January 1997 until December 2001, when he elected early retirement.  As controller, Woolley was responsible for MS&T's financial accounting.  He was also Andersen's primary contact at MS&T.  Woolley, who is not a CPA, reported directly to Pallas and indirectly to Hopper.

## OTHER RELEVANT ENTITIES

15.     **CMS Energy Corp.**, a Michigan corporation headquartered in Jackson, is an integrated energy company operating in the United States and in selected markets worldwide. Through its subsidiaries, it owns and operates a regulated public utility and sells energy into various unregulated markets. During the relevant period, MS&T was active in marketing its own electricity (retail) and trading electricity and natural gas (wholesale). During the relevant period, CMS also engaged in independent power production and oil and gas exploration and production.

16.     **Arthur Andersen LLP** was a limited liability partnership headquartered in Chicago, Illinois that provided accounting, auditing and related services during the relevant period. Andersen performed CMS's external audits.

## FACTS

### A.     Background

17.     In the fall of 1999, CMS recruited Pallas, then head of Reliant Energy Inc.'s ("Reliant's") trading operations, to lead MS&T and expand its business.[3] CMS, which operates the largest public utility in Michigan, was forecasting double-digit earnings growth to be fueled by MS&T and CMS's other unregulated businesses.

---

[3]     As discussed below, Reliant was the counterparty to the vast majority of CMS's round-trip transactions. On May 12, 2003, the Commission issued a settled cease-and-desist order arising in part from Reliant's round-trip trading. *In the Matter of Reliant Resources, Inc. and Reliant Energy, Inc.*, Rel. Nos. 33-8232 and 34-47828; AAE.Rel. No. 1780. In the order, the Commission found that Reliant had violated the antifraud, reporting, record-keeping and internal controls provisions of the federal securities laws. Contemporaneous with the filing of this Complaint, the Commission is issuing a settled cease-and-desist order arising from CMS's round-trip trading. *In the Matter of CMS Energy Corp. and Terry Woolley*, Rel. Nos. 33-____ and 34-____; AAE Rel. No. ____. Like the Reliant order, the CMS order contains findings that CMS violated the antifraud, reporting, record-keeping and internal controls provisions of the federal securities laws.

18.     Before coming to CMS, Pallas had spearheaded Reliant's efforts to advance in the industry volume rankings through round-trip trades.  Various industry periodicals, such as *Power Markets Weekly* and *Gas Daily*, publish trading volumes reported by energy companies to the Federal Energy Regulatory Commission ("FERC") or directly to the periodicals.  The periodicals rank the energy companies by the volume of energy bought and sold.  These rankings are known in industry circles as the "league tables."  In 1999, under Pallas's watch, Reliant began its ascent up the league tables by engaging in massive round-trip trades.[5]

**B.     Round-Trip Electric Power Trading at MS&T**

19.     After Pallas was hired to expand MS&T's business, she relocated the office to Houston and began recruiting energy traders.  She also formulated a business plan of marketing to cooperatives and municipalities in the hopes of landing long-term power "origination" contracts.

20.     Pallas viewed trading volume rankings as important.  She theorized that some municipalities and cooperatives issued Requests for Proposals ("RFPs") to "Top 20" or "Top 25" energy companies.  MS&T was ranked 36th among power traders in 1998 but had plummeted to 48th by the end of the second quarter of 2000.

---

[5]     These trades were not with CMS; CMS did not begin round-tripping until it hired Pallas.

### a.    Round-Tripping With Reliant

21.    In the spring of 2000, after discussions with a former colleague at Reliant, Pallas instructed traders at MS&T to conduct round-trip trades with Reliant to manufacture trading volumes and foster the appearance of robust business activity.  In July 2000, CMS and Reliant entered into a standard netting agreement that permitted both parties to settle offsetting wholesale transactions on a net basis.  Essentially, the netting agreement netted the power or cash to be delivered from one party to the other resulting from trades of similar commodities between the two parties.

22.    Because round-trip trades entail identical quantities, at identical prices, of identical commodities, at identical delivery points, execution of the netting agreement meant that round-trip trades would result in no exchange between CMS and Reliant of commodities or cash.  After the netting agreement was signed, Pallas instructed her staff to begin round-tripping with Reliant.

23.    The first round-trip trade occurred in July 2000.  This massive transaction – which involved 10 million megawatt hours and $380 million – was about 1,000 times larger than the typical MS&T power trade.  MS&T had determined that this volume would place it within the Top 20 in the league tables.

24.    After the first trade, MS&T entered into round-trip trades of similar magnitude in each successive quarter in order to maintain a Top 20 ranking, at Pallas's direction.  The Houston-based MS&T trader communicated with the Reliant trader by telephone or e-mail in order to pre-arrange the trades' terms.  The volumes were typically in the range of 10-20 million megawatt hours.

> **b.   Efforts to Avoid Public Detection of
> Electric Power Round-Trip Trading**

25.     The MS&T trader took pains to prevent embarrassing public detection of the practice.  Beginning in the fourth quarter of 2000, the MS&T trader disguised the trades by splitting them into multiple components, for delivery in different geographic regions, with slight price differentials.   Despite these differentials, neither delivery nor payment was contemplated, due to the trades' lack of economic substance.   Viewed as one linked transaction, they amounted to a round-trip trade.

26.     MS&T and Reliant continued to disguise the trades over the next two quarters.  Then, on June 1, 2001, an industry publication noted: "CMS and Reliant traded about 20 million Mwh, lifting CMS up from the rank of 56th a year ago to 18th for first-quarter 2001."[6]  In August 2001, a second industry publication article stated that MS&T "has Reliant as a counterparty for about 90% of its power sales."[7]

27.     The prospect that MS&T's sham trading activity might be exposed prompted Pallas to instruct her staff to seek out another round-trip counterparty.  On November 15, 2001, MS&T and Dynegy Inc. entered into two round-trip power trades so large – a combined total of more than 25 million megawatt hours of electricity – that Dynegy had to override its trading platform's volume limits to execute them.

> **C.     MS&T's Natural Gas Round-Trip Trade**

28.     In addition to electric power round-trip trading, MS&T conducted one natural gas round-trip trade.  Pallas personally directed an MS&T trader to enter the trade

---

[6]      *Platt's Electric Power Daily, Latest Ranking of Power Sellers Shows Big Sales Boost: Are West's Woes Responsible?* (June 1, 2001).

[7]      *Platt's Power Markets Week, Volatility, Restructuring Boosts Volume; 2Q Reaches 1.5 Billion Mwh* (Aug. 20, 2001).

into MS&T's system and furnished him with the transaction's terms.  The trade, which occurred on June 1, 2001, called for retroactive delivery of gas in April, May and June 2001 – an obvious impossibility.

### D.     Improper Accounting and Non-Disclosure

#### a.      Round-Trip Trades in 2000

29.     The chairman of the audit committee of CMS's Board of Directors conducted quarterly conference calls with Hopper and Andersen's Michigan-based audit engagement partner.  In October 2000, shortly before the third-quarter 2000 conference call,[8] a Houston-based Andersen staff accountant working on MS&T's quarterly review discovered the $380 million round-trip trade with Reliant and brought it to the attention of her supervisors in Houston and to MS&T.  She then relayed the information to the Andersen engagement partner, who raised the issue with CMS's audit committee chairman and Hopper during the third-quarter 2000 conference call.

30.     During the call, Hopper stated that MS&T conducted the trade to establish its trading business and increase its trading volumes.  He also said the trade was memorialized by all the necessary transaction documents, such as deal tickets and trade confirmations, and therefore should be deemed a legitimate sale of energy.  Hopper assured Andersen and the audit committee chairman that the transaction met the technical criteria for a sale and that he was comfortable with the accounting.

31.     Although Andersen had been led to believe that the round-trip trade was a one-time occurrence, additional round-trip trading occurred during the fourth quarter of 2000.  Andersen did not detect the fourth-quarter trades.  Nor did Pallas, Hopper or

---

[8]      CMS's fiscal year ends on December 31st.

*SEC v. Hopper, et al.*
Complaint

anyone else disclose them to Andersen. Andersen issued an audit report containing an unqualified audit opinion certifying CMS's 2000 financial statements.

32.    Due largely to the year-2000 round-trip trades, MS&T's revenues quadrupled -- from $800 million in 1999 to $3.2 billion in 2000. CMS's revenues also soared by some 47% in 2000 over its 1999 revenues. CMS also reported a 919% increase in 2000 over its 1999 power trading volume. Neither Pallas nor Hopper caused CMS to disclose that a significant portion of MS&T's revenues and volume, or that a significant portion of the 47% increase in CMS's revenues, were improper.

#### b.    Round-Trip Trades in 2001

#### MS&T Engages in $1.2 Billion in
#### Round-Trip Trades in the First Quarter of 2001

33.    The meteoric rise in revenues and trading volume continued through the first quarter of 2001. In April 2001, CMS scheduled a special meeting of its Board of Directors in Houston to showcase its operations there, including an informational session about MS&T to be presented by Pallas. Before the special meeting, Hopper participated in the first quarter 2001 conference call with the Andersen engagement partner and the CMS audit committee chairman. An Andersen accountant's notes reflect discussion of the following points regarding MS&T in the conference call:

- 1st Q revenues up from $0.4 billion in 2000 to $2.4 billion in 2001.

- $1.2 billion of "no margin" deals done in the 1st Quarter.

- Half of the total revenue recorded in the quarter was for 3 power arrangements with Reliant where we agreed to sell to them and they agreed to sell to us under identical terms. Physical delivery will not occur and there is no margin on the deals.

- All of the legal documents support these trades (*i.e.*, normal deal tickets, documentation the same as all other deals, confirmations are received for each transaction), but they appear to lack substance.

- We are continuing to discuss this with our industry people to ensure this meets industry practice.

34.     Hopper assured the audit committee chairman during the call that MS&T was following the proper accounting rules for the trades.

### Pallas's Presentation about
### MS&T to CMS's Board of Directors

35.     Later that day at the informational session, Pallas made a brief presentation to the CMS Board of Directors and members of CMS senior management. During her presentation, Pallas briefly addressed the practice of round-trip trading, but omitted the most troubling details – details that became apparent only after CMS's internal investigation of the trades in May 2002.

36.     Pallas described the trades as a marketing ploy that would enable MS&T to scale the industry rankings and attract more business. But Pallas never disclosed that the round-trip trades were pre-arranged or devoid of risk. Nor did she explain the extent of the MS&T trading volumes and revenues generated by round-trip trading.

### Andersen's Accounting Guidance

37.     As noted above, Andersen had been led to believe that the round-trip trade in the third quarter of 2000 was a one-time occurrence. During the quarterly review for the first quarter of 2001, Andersen learned that M&T had engaged in an additional $1.2 billion in round-trip trades during the first quarter. At that time, Andersen's Houston-

based audit partner requested that his staff research the appropriate accounting treatment for the trades.[9]

38.     This research resulted in a May 14, 2001 memorandum by the MS&T audit manager in Houston, concluding that the revenues and expenses from round-trip trades must be recorded on a net basis – contrary to MS&T's practice of recording them gross. Andersen informed Woolley, MS&T's controller, of this conclusion, but he failed to convey the information to his superiors at CMS in Detroit. Therefore, CMS presented the revenues and expenses from the round-trip trades on a gross basis in its second-quarter 2001 Form 10-Q.

39.     The issue of the proper accounting for the round-trip trades came to a head in the third quarter of 2001. Andersen instructed CMS that energy trades could be recorded gross only if the following three criteria were satisfied:

- Parties must be at risk for both credit and performance;

- Title to the related commodity must transfer; and

- Settlement must be for gross proceeds (checks must be exchanged and cashed for the gross amount of the transaction).

40.     The round-trip trades – which involved no risk, no transfer of title and no exchange of cash – could not satisfy Andersen's criteria and therefore the revenues and expenses should not have been recorded gross. When Hopper forwarded Andersen's

---

[9]     Andersen researched Derivative Implementation Issue K1 under Statement of Financial Accounting Standards 133. SFAS 133 is titled "Accounting for Derivative Instruments and Hedging Activities." Issue K1 of SFAS 133 sets forth the following criteria that, when met by a group of transactions, indicate that the contracts should be viewed as a unit: (1) the contracts are entered into contemporaneously and in contemplation of one another; (2) the contracts are executed with the same counterparty; (3) the contracts relate to the same risk; and (4) there is no substantive business purpose for structuring the transactions separately. Applying the criteria, Andersen appropriately concluded that the round-trip trades should be recorded on a net basis.

criteria to Pallas and Woolley in October 2001, he wrote, "Call if you want to discuss, or have a different idea about how to get credit for volumes without jeopardizing the fair presentation of the income statement."

41.     Upon receipt of the criteria, Hopper, Pallas and Woolley initially agreed that Woolley would not record the trades "gross" in the financial statements, but would still recognize them in CMS's "internal reports" and report the volumes to industry publications and FERC. Upon reflection, however, Pallas decided that round-trip trading was no longer worthwhile and directed MS&T's traders to discontinue them.

42.     Despite the criteria, CMS reported, on a gross basis, revenues and expenses from MS&T's third quarter 2001 round-trip trades, resulting in material financial misstatements. Hopper and his staff simply failed to net the revenues and expenses from the third quarter round-trip trades.

       **c.**     **CMS's 2001 Form 10-K:**
               **Reclassification of Round-Trip Trading Results**

                      **Fourth Quarter 2001**

43.     MS&T conducted additional trades in November 2001 with Dynegy[10] and in December 2001 with Reliant. The revenues from MS&T's fourth-quarter round-trip trades, however, never appeared in public filings, because Andersen instructed CMS to account for the trades on a net basis.

---

[10]     In September 2002, the Commission issued a settled cease-and-desist order, finding violations by Dynegy of the antifraud and other provisions of the federal securities laws. The Commission found that the violations arose, in part, from Dynegy's round-trip trades with CMS. *In the Matter of Dynegy Inc.*, Lit. Rel. No. 17744, September 25, 2002.

## Reclassification

44.     In mid-March 2002, while performing CMS's audit, Andersen reiterated that revenues and expenses from all third and fourth quarter 2001 round-trip trades would have to be recorded on a net basis. Shortly thereafter, Andersen instructed CMS that all round-trip trades would have to be reclassified on a net basis. All 2001 round-trip trades were reclassified. But chief accounting officer Hopper failed to have CMS reclassify the $1.0 billion in revenues and expenses from the 2000 round-trip trades. Nor did Pallas alert anyone to the $1.0 billion in 2000 round-trip trades.

### Misleading Footnote Disclosure

45.     In March 2002, Andersen instructed that CMS disclose the "zero margin" transactions. CMS had already reclassified its 2001 operating revenues to eliminate the results of round-trip trades. The footnote disclosure was prepared by the Andersen accountant in concert with an internal CMS accountant who reported to Hopper, but lacked detailed knowledge of the round-trip trading. The footnote stated:

> **Reclassifications:** During 2001, CMS Energy entered into several energy trading contracts with counterparties. The impact of these trades increased operating revenue with a corresponding increase in operating expenses. During the fourth quarter of 2001, it was determined that under SFAS No. 133 and related interpretations, these trades should have been recorded on a net basis. First, second, and third quarter operating revenue and operating expenses have been restated from the amounts previously reported to reflect these trades on a net basis. There was no impact on previously reported consolidated net income.

46.     There was no explanation in the footnote that the "trading contracts" were pre-arranged, that they lacked economic substance, or that their sole admitted purpose

was to inflate MS&T's volume rankings. Nor did the footnote mention the staggering amounts of revenue that had been restated to correct this practice, $4.2 billion. In fact, the only way an investor could have deduced the amount of the reclassified revenues for each quarter of 2001 would have been to compare the revenues and expenses from CMS's 2001 Form 10-K with the revenues and expenses from the preceding Forms 10-Q.

47. Acting with full knowledge of the pertinent facts, Hopper personally approved the footnote. The footnote was prepared just one day before the deadline for delivery of the draft Form 10-K to the printer and *after* the final review and approval of the report by its CMS management signatories. Thus, alone among CMS's senior management, Hopper reviewed the footnote and approved its inclusion in CMS's 2001 Form 10-K, which was filed with the misleading footnote, on March 29, 2002. Further, despite her acute awareness of the round-trip trades and the reclassification decision, Pallas took no steps to ensure meaningful disclosure.

### E.    **Public Touting of Volumes and Revenues**

48. During the period of round-trip trading – third quarter 2000 through 2001 – CMS released into the market false information stemming from the trades. CMS included statistics inflated by round-trip trading in its periodic filings with the Commission, quarterly earnings press releases, investor presentations, FERC reports and reports to the industry publications for inclusion in the league tables. These public misstatements could not have occurred without, and were created by, the conduct of Pallas and Hopper as alleged in this Complaint.

a.      **Filings with the Commission**

49.     Hopper caused CMS to record round-trip revenue in its periodic filings with the Commission, in violation of its stated "Revenue Recognition Policy." According to the 2000 Form 10-K, CMS recorded revenue on "delivery." That statement was false as applied to the round-trip trades, as to which no delivery was contemplated or occurred, though they purported to be "physical" energy trades. As chief accounting officer, Hopper was responsible for the misleading description of the revenue recognition policy.

50.     CMS also cited the staggering percentage increases in MS&T's trading volume in the MS&T "Results of Operations" portion of CMS's Commission filings.

51.     Before the third quarter 2000, CMS did not make reference to trading volumes in its filing. After MS&T's first round-trip trade occurred in the third quarter 2000, however, CMS began a pattern of misleading reporting of trading volumes. The third quarter 2000 Form 10-Q provides: "The volumes of marketed natural gas and power traded increased 72 percent and *over 1000 percent* respectively [as compared to third quarter 1999]." (Emphasis added).

52.     The 2000 Form 10-K states: "The volumes of marketed natural gas and power traded increased 31 percent and *919 percent*, respectively. Partially offsetting these increases were *lower power trading margins, primarily due to cooler than normal summer weather in Michigan*, and increased operating expenses as the business continues to expand its trading and marketing activities and increase its customer base." (Emphasis added). In fact, the lower power trading margins were "primarily" due to Pallas's round-trip trading, not unseasonably cool weather.

53. The first quarter 2001 Form 10-Q provides: "The physical volumes of marketed and managed natural gas and power traded increased 17 percent and *1,383 percent*, respectively, due largely to significantly increased *lower-margin* energy marketing and trading transactions." (Emphasis added). The 1,383 percent increase in physical power volumes traded was due overwhelmingly to Pallas's round-trip trading and was not "due largely to significantly increased lower-margin energy marketing and trading transactions."

54. Thus, misleading statements regarding volume percentage increases appeared in the third quarter 2000 Form 10-Q, 2000 Form 10-K and first quarter 2001 Form 10-Q. Moreover, volume comparisons in the third quarter 2000 Form 10-Q, the 2000 Form 10-K and the first quarter 2001 Form 10-Q were especially misleading because no round-trip trades occurred in the same quarters of the prior year. Further, the 2001 10-K repeated the misinformation previously disseminated in the 2000 10-K.

55. In addition, the third quarter 2001 Form 10-Q contained raw volume statistics in megawatts of power and btu's of natural gas traded. Those statistics were also grossly inflated due to round-trip trading.

56. Hopper was primarily responsible for preparing CMS's Commission filings. In addition, in preparing the filings, Hopper circulated drafts to each business unit within CMS, including MS&T. Pallas received drafts of the filings for the purpose of reviewing the accuracy of disclosures regarding MS&T. Pallas did not comment on, much less seek to correct, the misreporting of MS&T's volumes or revenues in any of the Hopper-drafted filings forwarded to MS&T.

### b.   Quarterly Earnings Releases

57.     CMS's quarterly earnings releases invariably contained a paragraph citing the gross revenues of the company.  From the second quarter 2000 release to the third quarter 2001 release, this revenue figure increased dramatically, from $6 billion to $15 billion, due chiefly to the round-trip trading.

58.     But CMS's releases failed to mention the source of the soaring revenues (*i.e.*, round-trip trades) or the offsetting expenses associated with the trades.  Moreover, beginning with the third quarter 2000 earnings release, CMS attributed the increase in revenues to "lower-margin" – as opposed to "no-margin" – energy marketing and trading. Quarter after quarter, CMS cited revenue explosion due to "lower-margin" trading.

59.     Specifically, the quarterly releases provided as follows:

- Third quarter 2000: "Third quarter operating revenue totaled $2.40 billion, up 63 percent from $1.47 billion in the third quarter of 1999, due mainly to increased *lower-margin* energy marketing revenues." (Emphasis added).

- Year-end 2000: "Fourth quarter operating revenue totaled $3.19 billion, compared to $1.77 billion in the fourth quarter of 1999.  Consolidated operating revenue for 2000 grew 47 percent to $9.0 billion, from $6.1 billion in 1999, due largely to significantly increased *lower-margin* energy marketing and trading transactions."  (Emphasis added).

- First quarter 2001: "First quarter operating revenue totaled $4.13 billion, up 126 percent from $1.83 billion in the first quarter of 2000, due largely to significantly increased *lower-margin* energy marketing and trading transactions." (Emphasis added).

- Second quarter 2001: "Second quarter operating revenue totaled $4.4 billion, up 175 percent from $1.6 billion in the second quarter of 2000, due largely to

significantly increased *lower-margin* energy marketing and trading transactions." (Emphasis added).

- Third quarter 2001: "Third quarter operating revenue totaled $3.0 billion, up 29 percent from $2.32 billion in the third quarter of 2000, due largely to increased *lower-margin* energy marketing and trading transactions." (Emphasis added).

60. The phrase "lower-margin" misleadingly implies that the trading involved *some* margin, whereas round-trip trades, by their very nature, are "no-margin" trades. This phrase appeared in each quarterly earnings release until the year-end 2002 release, in which CMS jettisoned any mention of revenues, without explanation.

61. In the year-end 2000 earnings release, CMS also touted volume increases. Specifically, CMS touted a 919% increase in power trading volume, as compared to 1999 (the same year-to-year increase set forth in its 2000 Form 10-K), without mentioning the round-trip trades or quantifying how much of the increase was attributable to the trades.

62. Hopper received and reviewed the earnings releases before their public dissemination. He and his direct subordinates provided and confirmed the data contained in the releases. As CMS's chief accounting officer, he had a duty to ensure that accurate information regarding CMS's finances and business activities was supplied to the market. Yet he suggested no revision of these misleading disclosures prior to issuance of the releases.

63. In addition, Pallas was aware that MS&T's volumes and revenues were being used in the releases. She was also acutely aware that a significant amount of the revenue increases were due to *no margin* trades, as opposed to the "lower margin" trades discussed in the releases. Yet she suggested no revision of these misleading disclosures prior to issuance of the releases. As the chief executive of a division CMS was actively

promoting as a growth engine, Pallas had a duty to ensure that accurate information regarding MS&T's finances and business activities was supplied to the market.

### c. Investor Presentations

64. CMS investor presentations and quarterly earnings web-cast conference calls sometimes involved discussions of MS&T's growth, specifically, growth in MS&T's revenues and trading volumes. Those discussions failed to disclose that growth in revenues and trading volumes were directly attributable to round-trip trades.

65. For example, during the first quarter 2001 earnings web-cast, CMS's CEO gave an overview that emphasized MS&T's planned growth. Another CMS executive provided additional detail regarding MS&T, mentioning "growth" several times. Reading from web-cast slides that reflected graphically *$4.5 billion* in MS&T revenues, volume increases during 2000 of *1000 percent* and planned *doubling* of volumes for 2001, the executive stated:

> We've seen tremendous growth since we've restructured this organization and we, as you can see for this year, see a continuation of that growth. *In the power side, our volumes increased ten-fold – 2000 over 1999, we're looking at a doubling of those volumes again this year.* And in the green in the power volumes, you can see that we've already billed about a third of that volume so far in the calendar year 2001. Physical gas, financial gas, similar growth stories. In each case, they show the first quarter volumes pretty much on track to achieve those volumes at year-end.
>
> *We don't focus on volumes for volume sake.* We focus on really what kind of growth we're making in this business and I'll show you toward the end the overall growth in earnings that we've seen there as well.

(Emphasis added).[11] At an October 26, 2001 presentation, CMS executives also emphasized MS&T's growth. CMS's then-CFO stated, "That unit [MS&T] has been able to generate substantial growth way in fact beyond our expectations. We would expect that growth to continue." CMS's COO added, "[MS&T] is a small outfit and has the ability to grow at a fairly high percentage because of the size we are. We think we can deliver these rates of growth."

66.     Pallas's round-trip trades created this "growth."

**F.     Analysts' Favorable Reaction**

67.     Analysts picked up on CMS's touting of the round-trip revenue and volume. Fahnestock & Co. noted in a May 1, 2001 report that CMS's revenues rose 126% in the first quarter of 2001, "reaching $4.13 billion. Growth in CMS Energy's lower-margin marketing, services and trading business accounted for nearly $2.0 billion or about 87% of the increase." The report continued, "Marketing, services and trading revenue grew more than 500 % in Q1/01 to $2.3 billion. Operating earnings for this lower margin business grew by 133% to $7 million for 1Q/01."

68.     A July 9, 2001 report from CIBC World Markets noted:

> CMS Energy's marketing, services and trading group – CMS MST – is relatively small, but growing rapidly. The group tripled its operating income from 1999 to 2000, primarily through a six-fold increase in electricity volumes marketed. It plans to achieve continued growth without taking on significant trading risk.

69.     The CIBC report continued, "Given the company's increase in volumes marketed last year, its expanded operations and growth objectives, we are forecasting that

---

[11]     At least one investor presentation contained a slide showing the top 20 in the league tables, with CMS' ranking displayed in bold letters.

the pretax operating income contribution from CMS MST will nearly double over the next two years (to $27 million in 2002)."

70.   Finally, a February 7, 2002 Merrill Lynch report noted that although MS&T had endured a disappointing fourth quarter, "positives" included "higher electric volumes."   Notably, this report came long after CMS had been instructed to stop accounting for round-trip trades on a gross basis.   CMS was still including round-trip trades in its volume citations.

### G.   Financial Rewards from Round-Trip Trading

71.   Pallas received lavish bonuses during the period of round-trip trading.   In early 2001, CMS awarded her a $345,000 bonus for her performance during 2000.   This bonus was in addition to her $345,000 salary at the time.   Later that year, CMS increased her salary to $363,000.   In early 2002, she received an award of $726,000, equal to twice her 2001 salary.   Thus, her total 2001 compensation was $1,089,000.   She also received stock options.

72.   Hopper also received a bonus for year 2000 of approximately $185,629.   His salary for 2000 was $312,000.   In 2001, Hopper received a salary increase to $335,000.

### H.   The Round-Trip Trades' Impact on CMS's Stock Price

73.   The truth regarding MS&T's round-trip trading trickled into the market over a 48-day period, during which CMS's stock price declined by 33%.   On March 29, 2002, CMS filed its 2001 10-K reclassifying $4.2 billion in revenue and expenses for 2001, without explaining that the reclassification was to correct improper accounting for the round-trip trades.

74.     Hopper personally approved the misleading footnote disclosure in that filing. Likewise, Pallas failed to suggest a more complete explanation. CMS failed to disclose any additional information regarding the reclassification or round-trip trades until May 9, 2002. Nevertheless, CMS's stock declined $2, to approximately $20 per share, during that period - - a 10% decrease from the reclassification date.

75.     On Friday May 10, 2002, CMS announced an informal inquiry by the SEC regarding "certain trades with Dynegy." Although CMS's stock dropped $3 dollars to $16 per share at market close on Friday, the stock rebounded to close at $17.25 per share the following Monday. On Wednesday, May 15, 2002, CMS belatedly issued a detailed description of the round-trip trades and their impact on revenues and volumes. Although the stock closed twenty cents' higher at $17.23, it fell to $15.25 per share on May 16, the next trading day, an 11.5% decrease. Thus, between March 29, 2002, the date of filing the misleading 2001 Form 10-K, and the day after the May 15 release, CMS's stock price had declined by approximately 33%.

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act

76.     Paragraphs 1 through 75 are realleged and incorporated by reference.

77.     Defendants Hopper and Pallas, in the offer or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

78.     Defendants Hopper and Pallas engaged in the conduct described in this claim knowingly or with severe recklessness.

79.     By reason of the foregoing, Hopper and Pallas violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act. [15 U.S.C. § 77q].

**SECOND CLAIM**
**Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5 Thereunder**

80.     Paragraphs 1 through 75 are realleged and incorporated by reference.

81.     Defendants Hopper and Pallas, in connection with the purchase or sale of securities, have:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

82.     Defendants Hopper and Pallas engaged in the conduct described in this claim knowingly or with severe recklessness.

83.     By reason of the foregoing, Hopper and Pallas violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act.  [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**Violations of Exchange**
**Act Rule 13b2-1**

84.     Paragraphs 1 through 75 are realleged and incorporated by reference.

85.     Defendant Hopper, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2) of the Exchange Act.

86.     By reason of the foregoing, Hopper violated, and unless enjoined, will continue to violate Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FOURTH CLAIM
### Aiding and Abetting CMS's Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5 Thereunder

87.     Paragraphs 1 through 75 are realleged and incorporated by reference.

88.     Based on the conduct alleged herein, CMS violated Section 10(b) of the Exchange Act and Rule 10b-5 by filing materially misleading annual and quarterly reports with the Commission and by making public misrepresentations resulting from the round-trip trading scheme.

89.     Defendants Hopper, Pallas and Woolley, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to CMS in connection with its violations of Section 10(b) and Rule 10b-5.

90.     By reason of the foregoing, Hopper and Pallas aided and abetted CMS's violations of, and unless restrained and enjoined, will aid and abet further violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and Rule 10b-5. [17 C.F.R. §§ 240.10b-5]. In addition, in the manner set forth above, Woolley aided and abetted violations of the same provisions.

## FIFTH CLAIM
### Aiding and Abetting CMS's Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder

91.     Paragraphs 1 through 75 are realleged and incorporated by reference.

92.     Based on the conduct alleged herein, CMS violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

93.     Defendants Hopper, Pallas and Woolley, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to CMS, as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

94.     By reason of the foregoing, Hopper and Pallas aided and abetted CMS's violations of, and unless restrained and enjoined, will aid and abet further violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder.  [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].  In addition, in the manner set forth above, Woolley aided and abetted violations of the same provisions.

**SIXTH CLAIM**
**Aiding and Abetting CMS's Violations**
**of Section 13(b)(2)(A) and (B) of the Exchange Act**

95.     Paragraphs 1 through 75 are realleged and incorporated by reference.

96.     Based on the conduct alleged herein, CMS violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

97.     Defendants Hopper and Woolley, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to CMS in connection with its failure to make and keep books, records, and accounts, which, in

reasonable detail, accurately and fairly reflected CMS's transactions and dispositions of its assets.

98.     Defendant Hopper and Woolley, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to CMS in connection with its failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

99.     By reason of the foregoing, Hopper aided and abetted CMS's violation of, and unless restrained and enjoined, will aid and abet further violations of Sections 13(b)(2)(A) and (B) of the Exchange Act.  [15 U.S.C. § 78m(b)(2)(A)].  In addition, in the manner set forth above, Woolley aided and abetted violations of the same provisions.

## REQUEST FOR RELIEF

For these reasons, the Commission respectfully requests that the Court:

### I.

Find that the defendants committed the alleged violations.

### II.

Permanently restrain and enjoin Hopper and Pallas from violating, or aiding and abetting, directly or indirectly, the provisions of law and rules alleged in this Complaint.

### III.

Order that Hopper and Pallas disgorge all ill-gotten gains, including pre-judgment and post-judgment interest, resulting from their participation in the alleged conduct, including salaries, bonuses, stock, or other compensation of any kind.

*SEC v. Hopper, et al.*
Complaint

## IV.

Order Hopper and Pallas to pay civil money penalties, plus post-judgment interest, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] in an amount to be determined by the Court.

## V.

Order that Hopper and Pallas, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], are prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Enter a Final Judgment ordering Woolley to pay a civil money penalty in the amount of $25,000 (twenty-five thousand dollars), pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Grant such other relief as this Court may deem just or appropriate.

Respectfully submitted,

Toby M. Galloway
(Attorney in Charge)
Texas Bar No. 00790733
SDTX No. 18947

Of Counsel:

SPENCER C. BARASCH
D.C. Bar No. 388886
SDTX No. 15249
JEFFREY A. COHEN
Florida Bar No. 606601
DOUGLAS A. GORDIMER
Member of the Maryland Bar
JOHN M. OSES
Texas Bar No. 00797187

Attorneys for Plaintiff
SECURITIES and EXCHANGE COMMISSION
801 Cherry St., 19th Floor
Fort Worth, Texas 76102
Office:  (817) 978-6447
Fax:     (817) 978-4927