IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. H-04-1054 |
| PRESTON HOPPER, TAMELA PALLAS, and TERRY WOOLLEY. | § § § | |
| Defendants. | § § § | |

## DEFENDANT TAMELA PALLAS' ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Tamela Pallas ("Pallas") files this answer to the First Amended Complaint of Plaintiff Securities Exchange Commission ("SEC").

## I.
## ANSWER

Pursuant to FED. R. CIV. P. 8, Pallas responds to the averments contained in the SEC's First Amended Complaint by correspondingly numbered paragraphs set forth below. Each and every allegation in the First Amended Complaint not expressly admitted below is denied.

1.    Pallas denies the allegations in paragraph 1 and footnote 1, except that Pallas admits: (i) she was the Chief Executive Officer ("CEO") of Reliant Energy Services ("RES") in 1999 until she left RES in October 1999 to become an executive of CMS Marketing Services & Trading ("MS&T"), a second-tier subsidiary of CMS Energy Corp. ("CMS"); (ii) Reliant Energy, Inc. ("Reliant") and CMS Energy Corp. ("CMS") were Fortune 500 companies during the relevant time period; (iii) after internal discussion, she approved traders at RES in 1999 doing the lawful energy trades at issue in

this dispute, which practice continued until she left RES in October 1999; (iv) after internal discussion, she approved traders doing the lawful energy trades at issue in this dispute at MS&T, which practice continued in 2000 and 2001; (v) that CMS changed its accounting methodology to account for the energy trades at issue in this dispute on a net rather than a gross basis after CMS' outside auditors reversed their earlier advice approving accounting on a gross basis which earlier advice the CMS Audit Committee and internal accountants had accepted; (vi) that Hopper was between 1999 and 2001 CMS' chief accounting officer; and (vii) that Hopper and the CMS Audit Committee approved the accounting for the transactions.  Pallas specifically denies: (i) she was in a position to control any trading at RES after terminating her employment with RES in October 1999; (ii) that she failed to disclose information regarding the trades to anyone to whom she had a duty to disclose under the circumstances or that she did not take action to prompt the disclosure of the trades to others at RES and Reliant; (iii) that the transactions were an unlawful scheme, improper, or sham transactions; (iv) that the accounting for the transactions was improper under the circumstances; (v) that Reliant or CMS were the entities doing the energy trades at issue in this dispute; (vi) that CMS' outside auditors forced a change in accounting methodology; (vii) that CMS' outside auditors were not aware of the transactions prior to the change in accounting methodology; and (viii) that Hopper fraudulently failed to disclose the reasons for the change.  Pallas is without knowledge or information sufficient to admit or deny that: (i) Hopper decided upon, sponsored, defended and vouched for the accounting for the transactions; (ii) how CMS' outside auditors became aware of the transactions; or (iii) all of the persons at Reliant or RES to whom the energy trades at issue in this dispute were

2

disclosed at Pallas' direction.   Therefore, to the extent necessary Pallas denies those allegations.

2.      Pallas denies the allegations in paragraph 2 and footnote 2, except that Pallas admits: (i) that the transactions at issue in this dispute involved the simultaneous purchase from and sale to the same counterparty of the same volume of either electric power or natural gas; (ii) that neither counter-party would profit from the transaction; (iii) that she and others approved the practice of doing the transactions at issue in this dispute at RES while she was employed by RES and at MS&T while she was employed by MS&T; and (iv) that what the SEC refers to as round-trip trades have also been referred to as wash trades, net-zero trades and zero-margin trades.

3.      Pallas denies the allegations in paragraph 3, except that Pallas admits based on information from Reliant: (i) that Reliant accounted for some of the energy trades at issue in this dispute on a gross basis while Pallas was employed by RES; and (ii) that the energy trades at issue in this dispute comprised approximately $1.4 billion of RES' revenue in 1999, $1.0 billion in 2000, and $3.8 billion in 2001.  Pallas specifically denies: (i) that the trades directly boosted revenues or were done for that purpose; (ii) that she was responsible for any increase in revenue attributed to the energy trades at issue in this dispute in Reliant's financial statements; (iii) that she had knowledge revenues from the energy trades at issue in this dispute were being included in Reliant's SEC filings; and (iv) that she participated in preparing any Reliant SEC filings.  Pallas is without knowledge or information sufficient to admit or deny the allegations in the fourth sentence.  Therefore, to the extent necessary Pallas denies those allegations.

4.    Pallas denies the allegations in paragraph 4, except that Pallas admits based on information from CMS: (i) that CMS SEC filings and press releases prepared by others included revenues and trading volumes attributable to the energy trades at issue in this dispute; and (ii) that the revenues associated with the trades referenced in paragraph 4 are the correct amounts. Pallas specifically denies that the trading volumes associated with the energy trades at issue in this dispute were artificial. Pallas also is without knowledge or information sufficient to admit or deny the allegations as they pertain to earnings conference calls and investor presentations.

5.    Pallas denies the allegations in paragraph 5, except that Pallas admits that: (i) the energy trades at issue in this dispute had no impact on net income; and (ii) that MS&T did the energy trades at issue in this dispute as a means to improve MS&T's profile with potential customers.

6.    Pallas denies the allegations in paragraph 6, except that Pallas admits based on public information and information obtained from CMS: (i) that CMS rose on the Fortune 500 list between 1999 and 2001; (ii) that CMS and its internal accountants and outside auditors decided to include revenues and expenses attributable to the energy trades at issue in this dispute in CMS' financial statements in 2000 and 2001; (iii) that CMS and its internal accountants and outside auditors decided to include revenues and expenses attributable to the energy trades at issue in this dispute in certain SEC filings and earnings releases in 2000 and 2001. Pallas also admits that she was one of Woolley's supervisors. Pallas specifically denies that volumes were inflated, that the trades were bogus or that the transactions were sham transactions. Pallas also specifically denies that

4

any revenues recognized in reliance upon the advice of CMS' outside auditors were improper.

7.    Pallas denies the allegations in paragraph 7, except that Pallas admits: (i) Arthur Andersen LLP ("Andersen") was CMS' outside auditor, (ii) Andersen conducted an audit of CMS in connection with the CMS' 2001 Form 10K; and (iii) CMS reclassified revenues and expenses from the energy trades at issue in this dispute based on Andersen's reversal of earlier advice.

8.    Pallas denies the allegations in paragraph 8, except that Pallas admits: (i) that persons other than Pallas were responsible for the content and accuracy of information provided to the Commission; and (ii) that CMS did not expressly specify in the reclassification footnote the amount of offsetting revenues and expenses that were being reclassified in its financial statements. Pallas is without knowledge or information sufficient to admit or deny the allegations concerning the information provided to the Commission in May 2002. To the extent that such allegations must be admitted or denied, such allegations are denied.

9.    Pallas admits that Reliant restated its revenues following the publication of news articles regarding the energy trades at issue in this dispute. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 9. To the extent that such allegations must be admitted or denied, such allegations are denied.

10.    To the extent necessary, Pallas denies the allegations in paragraph 10, and denies that the SEC is entitled to the relief requested therein. Pallas specifically denies the allegations that she was engaged in fraudulent activities, that she has violated the

antifraud provisions of the federal securities laws, and that she is the recipient of any ill-gotten gains.

11.    The allegations contained in paragraph 11 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations in paragraph 11.

12.    The allegations contained in paragraph 12 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies as vague the allegations in paragraph 12.

13.    The allegations contained in paragraph 13 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies as vague the allegations in paragraph 13.

14.    Pallas admits: (i) that Hopper served as CMS' chief accounting officer during the period covered by the First Amended Complaint; and (ii) that Hopper is no longer a CMS officer.  Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 14.  To the extent these allegations must be admitted or denied, they are denied.

15.    Pallas denies the allegations in paragraph 15, except that Pallas admits: (i) that she served as COO and, later, CEO of MS&T and that while she served as the CEO she was the most senior executive of MS&T; (ii) that she was one of the persons who supervised Terry Woolley; (iii) that she resigned from MS&T in May 2002; and (iv) that she served as Senior Vice President of RES in 1999.  Pallas specifically denies any implication that she had the technical knowledge or background necessary to form

independent opinions of the propriety of Woolley's accounting decisions or was responsible for supervising such accounting decisions.

16.    Pallas admits that Woolley was MS&T's controller until in or about December 2001 when he elected early retirement and that he was responsible for MS&T's financial accounting as controller.  Pallas also admits that Woolley reported to both Hopper and Pallas, but denies the SEC's characterization of the reporting.  Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 16.  To the extent that such allegations must be admitted or denied, such allegations are denied.

17.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 17.  To the extent that such allegations must be admitted or denied, such allegations are denied.

18.    Pallas admits the allegations in sentences 2 and 3 of paragraph 18.  Pallas is without knowledge or information sufficient to admit or deny the allegations in sentence 1 of paragraph 18.  To the extent that the allegations in sentence 1 of paragraph 18 must be admitted or denied, they are denied.

19.    Pallas admits that CMS, a Michigan corporation, is an energy company operating in the United States and that MS&T during the relevant time period marketed and traded electricity and natural gas.  Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 19.  To the extent that such allegations must be admitted or denied, they are denied.

20.    Pallas admits the allegations in paragraph 20.

21.    Pallas admits that various industry periodicals ranked energy companies based on trading volumes lawfully reported by those companies to FERC and that these rankings of FERC-reported trading volume are sometimes referred to in the industry as league tables. Pallas denies the remaining allegations in paragraph 21.

22.    Pallas denies as inaccurate, vague and misleading the allegations in paragraph 22, except that Pallas admits: (i) Pallas joined NorAm Energy Services, Inc. ("NES") as President in the summer of 1997, (ii) that in or about August 1997, NES merged with Houston, Industries, Inc., (iii) that Houston, Industries, Inc. changed its name in March 1999 to Reliant; and (iv) that she headed RES during part of 1999.

23.    Pallas denies the allegations in paragraph 23, except that Pallas admits: (i) that she participated in informal strategy meetings of RES executives that included, among other things strategies for lawfully increasing trading volumes; (ii) that one of the options considered and rejected as not in the best interests of RES due to cost was frequent in and out trades; and (iii) that one of the attendees of these meetings proposed without objection from others the concept of offsetting, large-volume purchases and sales with the same counter-party; (iv) that the lawful trades resulted in no profit or loss to either party; and (v) were intended to improve RES' rankings in league tables. Pallas specifically denies that the energy trades at issue in this dispute were a scheme, that the trades involved no commercial risk, or that they were intended to inflate rankings.

24.    Pallas denies the allegations in paragraph 24, except that Pallas admits that a goal of RES was to improve its rankings based on FERC-reported trading volumes. Pallas specifically denies that she was involved in the details of the energy trades at issue in this dispute generally or those specifically done by RES.

25.    Pallas denies the allegations in paragraph 25.  Pallas specifically denies she had a duty to notify or seek permission from any superior, accountant, legal staff, or external auditor before the energy trades at issue in this dispute were done, and denies the insinuation that she specifically avoided notifying or seeking permission from these individuals.  Pallas further denies she led, controlled, or had the technical skills required to oversee the accounting group.  Pallas also specifically denies that she did not take action to prompt the disclosure of the trades to others at RES and Reliant and that she did not personally speak with internal accountants about the transactions.  Pallas is without knowledge or information sufficient to admit or deny to whom the energy trades at issue in this dispute were disclosed at her direction but has reason to believe those persons included senior executives at Reliant.  Therefore, to the extent necessary Pallas denies those allegations.

26.    Pallas denies the allegations in paragraph 26, except that Pallas admits that she believed the energy-trading operation of RES was important in its own right.  Pallas specifically denies the allegation that the energy trades at issue in this dispute were a scheme or that the energy trades at issue in this dispute were the opposite of Perkins' strategic direction.

27.    Pallas denies the allegations in paragraph 27, except that Pallas admits based on information from Reliant that: (i) RES did the first of the energy trades at issue in this dispute in 1999; and (ii) RES did the trades described in the second and third sentences of paragraph 27.

28.    Pallas admits based on information from Reliant to the allegations in the first and second sentences of paragraph 28.  Pallas is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 28. To the extent such allegations must be admitted or denied, they are denied.

29.    Pallas admits she was aware of an adjustment regarding the Cokinos trade that was included in a Revised Reporting Package dated July 30, 1999 that she and numerous other RES executives received and that the Cokinos trade stood out as by far the largest on the page that included the words "Sales Pricing Adjustments." Pallas admits she was the head of RES, but denies the SEC's characterization of RES as a trading group of Reliant as ambiguous. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 29. To the extent such allegations must be admitted or denied, they are denied.

30.    Pallas denies the allegations in paragraph 30, except based on information from Reliant Pallas admits RES executed: (i) a $466 million-dollar power trade with EnCana Energy Services, Inc. on June 1, 1999; (ii) a power trade with Merchant Energy Group of the Americas, Inc. with a sale value of $380 million; (iii) a gas trade with Cokinos Energy on October 5, 1999; and (iv) an approximately $195 million-dollar power trade with Public Service Company of Colorado.

31.    Pallas denies the allegations in paragraph 31, except that Pallas admits based on information from Reliant that in 2000 RES entered into four trades totaling 30.32 million megawatt hours, three trades with MS&T and one trade with one other counterparty.

32.    Pallas denies the allegations in paragraph 32, except that Pallas admits based on information from Reliant and CMS that (i) in 2001 RES entered into four power trades totaling approximately 74.36 million megawatt hours with MS&T and one gas

trade with EnCana Energy Services, Inc. Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 32 regarding PanCanadian or the volumes of the MS&T trades as a percentage of RES' total trading volume. To the extent such allegations must be admitted or denied, they are denied.

33.    Pallas denies that Reliant reported all trades on a gross basis. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 33. To the extent such allegations must be admitted or denied, they are denied.

34.    Pallas denies the allegations in paragraph 34, except that Pallas admits that (i) revenue for a commodities trading company is not an important gauge of business or measure of success and is not important to her or any reasonable investor; and (ii) RES' publicly reported industry rankings of FERC-reported trading volumes were higher than they would have been without the energy trades at issue in this dispute.

35.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 35. To the extent such allegations must be admitted or denied, they are denied.

36.    Pallas admits that in the fall of 1999 she was recruited to lead MS&T and expand MS&T's business. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 36. To the extent such allegations must be admitted or denied, they are denied.

37.    Pallas denies the allegations in paragraph 37, except that Pallas admits: (i) after Pallas was hired to expand MS&T's business, MS&T began recruiting energy traders and opened an office in Houston; and (ii) Pallas formulated a business plan that

included, among many components, marketing to cooperatives and municipalities for the purpose of obtaining long-term power origination contracts.

38.    Pallas denies the allegations in paragraph 38, except that Pallas admits that during the relevant time period she understood that some municipalities and cooperatives might review the rankings of FERC-reported trading volumes and that some of those municipalities and cooperatives might only issue RFPs to the Top 20 or Top 25 energy companies.  Pallas is without knowledge or information sufficient to admit or deny the allegations in the third sentence of paragraph 38.  To the extent such allegations must be admitted or denied, they are denied.

39.    Pallas denies the allegations in paragraph 39, except that Pallas admits (i) that in 2000, she discussed the possibility of the energy trades at issue in this dispute between RES and MS&T with a person with whom she had worked at RES; (ii) that she authorized, after internal discussion and without objection from others, a trader at MS&T to do the type of energy trades at issue in this dispute with RES;  and (iii) that MS&T and RES entered into a standard netting agreement.

40.    Pallas denies the allegations in paragraph 40, except that Pallas admits that she authorized, after internal discussion and without objection from others, an MS&T trader to do the energy trades at issue in this dispute with RES.  Pallas specifically denies that the energy trades at issue in this dispute were a scheme and that she failed to disclose the energy trades at issue in this dispute to any person to whom she had a duty to disclose under the circumstances.

41.    Pallas denies the allegations in paragraph 41, except that Pallas admits that the first of the energy trades at issue in this dispute that MS&T did was in July 2000 for

10 million megawatt hours and $380 million. Pallas is without knowledge or information sufficient to admit or deny the allegations in the third sentence of paragraph 41. To the extent such allegations must be admitted or denied, they are denied.

42.    Pallas denies the allegations in paragraph 42, except that Pallas admits that (i) MS&T entered into the energy trades at issue in this dispute in every quarter from the third quarter of 2000 until the fourth quarter of 2001, which practice was known by and approved by CMS executives, outside auditors and board members; (ii) that a Houston-based MS&T trader communicated with an RES trader by telephone or e-mail in order to arrange the terms of the trades. Pallas specifically denies the description of the trades as "pre-arranged" as ambiguous, but admits that both the purchases and sales were negotiated at the same time.

43.    Pallas denies the allegations in paragraph 43, except that Pallas admits based on information from CMS that some of the energy trades at issue in this dispute were split into multiple components and had slight price differentials. Pallas specifically denies that she was involved in such details or agreements.

44.    Pallas specifically denies disguising any trades during her employment at MS&T or RES. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 44. To the extent such allegations must be admitted or denied, they are denied.

45.    Pallas denies the allegations in paragraph 45, except that Pallas admits that (i) Pallas authorized without objection from others the MS&T trader who was doing the trades to seek out another counterparty; and (ii) based on information from CMS, MS&T and Dynegy, Inc. entered into two of the energy trades at issue in this dispute on

November 15, 2001. Pallas is without knowledge or information sufficient to admit or deny the allegations regarding whether Dynegy had to override its trading platform's volume limits to execute them. To the extent these allegations must be admitted or denied, they are denied.

46.     Pallas denies the allegations in paragraph 46, except that Pallas admits: (i) that in addition to the electric power trades at issue in this dispute, MS&T did one natural gas trade with RES; (ii) that Delbert Blom headed MS&T's gas trading unit and reported to Pallas; (iii) that Pallas asked an MS&T employee to enter the transaction into MS&T's system, and (iv) that the trade was for a delivery period of April, May and June 2001. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 46. To the extent such allegations must be admitted or denied, they are denied.

47.     Pallas admits based on information from CMS and Andersen that: (i) quarterly conference calls were conducted between CMS' audit committee and the Andersen auditors; (ii) in October 2000, an Andersen employee became aware of the first of the energy trades at issue in this dispute that MS&T did with RES; and (iii) the issue of trade was specifically raised and discussed during the third-quarter 2000 conference call with Hopper and CMS' audit committee chairman. Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 47. To the extent such allegations must be admitted or denied, they are denied.

48.     Pallas admits based on information from Andersen that an Andersen memorandum contends that in a third-quarter audit committee conference call, Hopper, referring to the $380 million trade, stated that "technically the transaction met the criteria

for sale and as such, he was comfortable with the accounting." Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 48. To the extent such allegations must be admitted or denied, they are denied.

49.    Pallas denies the allegations in paragraph 49, except that Pallas admits based on information from CMS: (i) additional trades occurred during the fourth quarter of 2000; (ii) with knowledge of the trades at issue in this dispute, Andersen issued an unqualified audit opinion concerning CMS' 2000 financial statements; and (iii) Pallas did not personally bring the fourth quarter 2000 trades to Andersen's attention since she was uninvolved in those discussions and accounting decisions. Pallas specifically denies that Andersen was led to believe the trades were a one-time occurrence or that she had a duty or opportunity under the circumstances to personally bring the energy trades at issue in this dispute to Andersen's attention. Pallas is without knowledge or information sufficient to admit or deny whether Andersen detected the trades in the fourth quarter of 2000 or whether the trades were otherwise brought to Andersen's attention. To the extent such allegation must be admitted or denied, they are denied.

50.    Pallas denies the allegations in paragraph 50, except that Pallas admits based on information from CMS: (i) MS&T's revenues went from $800 million in 1999 to $3.2 billion in 2000; (ii) CMS reported a 919% increase in power trading volume in 2000 over 1999; and (iii) CMS' consolidated revenues increased by 47% in 2000 over 1999. Pallas specifically denies the implication that she had the responsibility or ability to cause CMS to disclose or to explain revenues or volumes in its filings.

51.    Pallas denies the allegations in paragraph 51, except based on information from CMS and Andersen, Pallas admits that; (i) Hopper participated in a first quarter

conference call with the Andersen engagement partner and the CMS audit committee chairman; and (ii) an Andersen document entitled "JDB Notes for 1st Quarter of 2001 Discussion Agenda William U. Parfet Conference Call" stated the bulleted points in paragraph 51. Pallas is without knowledge or information sufficient to admit or deny (i) who made the notes; (ii) whether the notes accurately reflect the discussion that occurred; and (iii) whether in April 2001 CMS scheduled a special meeting of its Board of Directors in Houston to showcase MS&T's operations. To the extent these allegations must be admitted or denied, they are denied.

52.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 52. To the extent the allegations must be admitted or denied, they are denied.

53.    Pallas denies the allegations in paragraph 53, except that Pallas admits that she made a presentation to the CMS Board of Directors at an April 2001 meeting during which she disclosed fully to the Board the energy trades at issue in this dispute and answered fully all questions directed to her. Pallas specifically denies the allegations that the presentation was brief and omitted troubling details about the energy trades at issue in this dispute. Pallas further specifically denies that the relevant details of the energy trades at issue in this dispute only became apparent after CMS' May 2002 internal investigation.

54.    Pallas denies the allegations in paragraph 54, except that Pallas admits that: (i) at the April 2001 meeting she did not specify the exact volumes traded for each specific trade; (ii) she described the trades as a marketing strategy; and (iii) she stated that RES had done such trades while she was at RES and she mentioned several other

companies with whom these trades had been done while she was at RES.  However, Pallas specifically denies that her explanation of the trades failed to disclose the magnitude of the trades and denies that she failed to describe energy trades at issue in this dispute with details sufficient to put listeners on notice that the trades were linked and offsetting.  Pallas also specifically denies: (i) that she described the trades merely as an accommodation to trading counter-parties; (ii) that she stated at the April meeting that the energy trades at issue in this dispute were common in the industry; (iii) that she misled the board in any way; and (iv) that she expressed relief and surprise that the board did not stop the energy trades at issue in this dispute.

55.    Pallas denies the allegation in footnote 7 to the extent it implies that CMS and its internal accountants and outside auditors were all in error when they originally recorded the energy trades at issue in this dispute on a gross basis.  Pallas also denies Andersen was led to believe the energy trades at issue in this dispute in the third quarter of 2000 were a one-time occurrence.  Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 55.  To the extent the allegations must be admitted or denied, they are denied.

56.    Pallas denies the allegations in paragraph 56, except that Pallas admits that she spoke to a Houston-based Andersen employee about the energy trades at issue in this dispute and that she disclosed that the trades had been done by others in the industry.  Pallas specifically denies that she made any false claims about industry practices concerning the trades.

57.    Pallas denies the allegations in paragraph 57, except that Pallas admits based on information from CMS and Andersen (i) that an Andersen employee by the

name of Brian Allman prepared at some time an internal memorandum dated May 14, 2001 discussing the recording of the energy trades at issue in this dispute; (ii) that the memorandum concluded that revenue and costs booked on the income statement should be netted against each other; and (iii) that CMS presented the revenues and expenses from the energy trades at issue in this dispute on a gross basis in its second-quarter 2001 Form 10-Q. Pallas specifically denies the allegation that it was MS&T's practice of recording the energy trades at issue in this dispute on a gross basis to the extent that it implies MS&T developed and controlled the manner by which the energy trades at issue in this dispute were recorded or that Andersen did not advise MS&T to do so. Pallas is without knowledge or information sufficient to admit or deny when the memorandum was created or what position Brian Allman held at Andersen when he created it. To the extent such allegations must be admitted or denied, they are denied.

58.     Pallas denies the allegations in paragraph 58, except that Pallas admits that the accounting for the energy trades at issue in this dispute became an issue with respect to the third quarter of 2001 when Anderson reversed its earlier advice and that Hopper identified the bulleted points as criteria that Andersen had indicated that they would be using. Pallas is without knowledge or information sufficient to admit or deny what instructions, if any, Andersen gave CMS. To the extent such allegations must be admitted or denied, they are denied.

59.     Pallas denies the allegations in paragraph 59, except that Pallas admits that: (i) Hopper concluded that the energy trades at issue in this dispute did not meet the criteria he communicated; (ii) that Hopper stated that the trades would no longer be recorded on a gross basis; (iii) that the energy trades at issue in this dispute involved no

exchange of cash; and (iv) and the allegations in the last sentence of paragraph 59. Pallas is without knowledge or information sufficient to admit or deny Andersen's criteria or whether the energy trades at issue in this dispute could have satisfied such criteria. To the extent such allegations must be admitted or denied, they are denied.

60.     Pallas denies the allegations in paragraph 60, except that Pallas admits that: (i) Pallas understood that Hopper and Woolley agreed to record the trades "net" in the financial statements; (ii) that Pallas later decided to cease doing the trades for reasons unrelated to CMS' accounting change; and (iii) that she instructed that the energy trades at issue in this dispute be discontinued. Pallas specifically denies any implication that her conclusion that the energy trades at issue in this dispute were no longer commercially worthwhile resulted from the change in accounting for those trades. With respect to the first sentence of paragraph 60, Pallas also specifically denies the allegations to the extent they imply that Hopper and Woolley's agreement regarding how to record the trades subsequently changed. Pallas is without knowledge or information sufficient to admit or deny how her instructions to stop the energy trades at issue in this dispute were interpreted. To the extent such allegations must be admitted or denied, they are denied.

61.     Pallas denies the allegations in paragraph 61, except that Pallas admits based on information from CMS that revenues and expenses for the energy trades at issue in this dispute were not netted but reported on a gross basis in CMS' third quarter 2001 filing which filing was approved in advance by Anderson. Pallas specifically denies that she failed to net the revenues from the energy trades at issue in this dispute or that she had the responsibility or the ability to do so. Pallas is without knowledge or information

sufficient to admit or deny whether Hopper and Andersen had argued and what they had argued about.  To the extent such allegations must be admitted or denied, they are denied.

62.    Pallas denies the allegations in paragraph 62, except that Pallas admits based on information from CMS that MS&T did two of the energy trades at issue in this dispute with Dynegy in November 2001 and one of the energy trades at issue in this dispute with RES in December 2001, and Pallas admits that the revenues from these trades did not appear in public filings.  Pallas specifically denies the allegation that they were not reported because of Andersen's instructions.

63.    Pallas denies the allegations in paragraph 63, except that Pallas admits based on information from CMS that: (i) Andersen advised in March 2002 that the energy trades at issue in this dispute for 2001 would need to be reclassified on a net basis; (ii) that Hopper expressed concern because he and Andersen had previously agreed that the trades would be netted beginning with the third quarter of 2001; and (iii) that after further discussion Hopper agreed that all the 2001 energy trades at issue in this dispute should be netted to avoid large variances from quarter to quarter (which agreement was reflected in a March 25, 2002 e-mail).  Pallas is without knowledge or information sufficient to admit or deny the allegations in the first sentence of paragraph 63.   To the extent these allegations must be admitted or denied, they are denied.

64.    Pallas denies the allegations in paragraph 64, except that Pallas admits she did not direct anyone to reclassify the 2000 energy trades at issue in this dispute.  However, Pallas specifically denies she had a duty or authority to do so, or even a reason to know that the reclassification or disclosure was needed.  Pallas is without knowledge or information sufficient to admit or deny when the energy trades at issue in this dispute

were reclassified, whether all of the 2001 energy trades at issue in this dispute were reclassified, who directed the reclassification of the energy trades at issue in this dispute, and what reclassifying the 2000 energy trades at issue in this dispute would have required in terms of Commission filings. To the extent these allegations must be admitted or denied, such allegations are denied.

65. Pallas denies the allegations in paragraph 65, except that Pallas admits based on information from CMS that the 2001 10K included a reclassifications footnote with language substantially similar to the language quoted in paragraph 65. Pallas specifically denies that: (i) Andersen instructed CMS to disclose the "zero margin" transactions; and (ii) that CMS had "already reclassified its 2001 operating revenues." Pallas is without knowledge or information sufficient to admit or deny who prepared the footnote disclosure, their knowledge, or the circumstances surrounding the preparation of the footnote disclosure. To the extent such allegations must be admitted or denied, they are denied.

66. Pallas denies the allegations in paragraph 66, except that Pallas admits: (i) that the footnote in the 2001 10-K did not detail the manner in which MS&T contracted for the trades, their purpose or the amount of revenue or expense that was being reclassified; and (ii) that a reasonable investor could have deduced the amount of the reclassified revenues and expenses for each quarter of 2001 by comparing the revenues and expenses from CMS' 2001 10K for each quarter of 2001 with the corresponding revenues and expenses from each 2001 10Q. Pallas specifically denies the SEC's implication that the footnote should have included the additional information set forth by the SEC in paragraph 66. Pallas is without knowledge or information sufficient to admit

or deny the allegations regarding Hopper. To the extent it is necessary to admit or deny these allegations, the allegations are denied

67.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 67. To the extent it is necessary to admit or deny these allegations, the allegations are denied.

68.    Pallas is without knowledge or information sufficient to admit or deny the allegations in the first sentence of paragraph 68. To the extent it is necessary to admit or deny these allegations, the allegations are denied. Pallas denies the allegations in the second sentence of paragraph 68, except that Pallas admits that she was aware of the energy trades at issue in this dispute and the reclassification decision, and that Pallas did not participate in the preparation of any of the related disclosures or reclassification. Pallas specifically denies: (i) that the footnote in the 2001 10-K was misleading; or (ii) that Pallas had any ability or authority, before or after filing, to alter such disclosures.

69.    Pallas denies the allegations in paragraph 69. However, Pallas specifically denies that she had any duty under the circumstances to make such disclosure or reason to believe that such disclosure was necessary. Pallas also specifically denies that the lawful trades were a "scheme" or was an "obviously questionable practice." Pallas is without knowledge or information sufficient to admit or deny the allegations with respect to Hopper. To the extent it is necessary to admit or deny these allegations, the allegations are denied.

70.    Pallas denies the allegations in paragraph 70, except that Pallas admits: (i) that MS&T did the type of trades at issue in this dispute from the third quarter 2000 through 2001; and (ii) that CMS included information derived from these trades in

Commission filings and quarterly earnings press releases.  Pallas denies that the information relating to the energy trades at issue in this dispute was false, inflated, or a misstatement.  Pallas is without knowledge or information sufficient to admit or deny the allegations with respect to investor presentations.  To the extent it is necessary to admit or deny these allegations, the allegations are denied.

71.     Pallas denies the allegations in paragraph 71, except that Pallas admits that the 2000 Form 10-K states that "revenues from physical and financial sales of energy commodities are recorded when delivered or net cash settled."  However, Pallas denies that this statement was false or misleading as applied to the energy trades at issue in this dispute and denies that the energy trades at issue in this dispute were recorded in violation of this policy.  The allegations in the last sentence of paragraph 71 are legal conclusions which cannot be admitted or denied.  To the extent that such allegations must be admitted or denied, they are denied.

72.     Pallas denies the allegations in paragraph 72, except that Pallas admits that the "Marketing, Services and Trading Results of Operation" for some Commission filings included percentage increases.

73.     Pallas denies the allegations in paragraph 73, except that Pallas admits the allegations in the last sentence of paragraph 73.  However, Pallas specifically denies that reporting trading volumes from the energy trades at issue in this dispute was misleading, or that CMS did not make reference to trading volumes in Commission filings prior to the third quarter 2000.

74.     Pallas denies the allegations in paragraph 74, except that Pallas admits the allegations in the first two sentences of paragraph 74.  Pallas specifically denies that the lower margins were due to a scheme.

75.     Pallas denies the allegations in paragraph 75, except that Pallas admits; (i) the allegation in the first sentence; and (ii) that the 1,383 percent increase in physical power volumes traded was due in part to the energy trades at issue in this dispute.  Pallas specifically denies that the energy trades at issue in this dispute were a scheme.

76.     Pallas denies the allegations in paragraph 76, except that Pallas admits that volume percentage increases appeared in the third quarter 2000 Form 10-Q, 2000 Form 10K, and the first quarter 2001 Form 10-Q.

77.     Pallas denies the allegations in paragraph 77, except that Pallas admits that the third quarter 2001 Form 10Q contained volume statistics in megawatts of power and btus of natural gas traded and that FERC-reported volumes associated with the energy trades at issue in this dispute were included in those statistics.  Pallas specifically denies those statistics were inflated.

78.     Pallas specifically denies the allegations in the first sentence of paragraph 78 because it is a legal conclusion which cannot be admitted or denied.  To the extent that the allegations in the first sentence must be admitted or denied, they are denied.  Pallas is without knowledge or information sufficient to admit or deny the allegations in the last sentence of paragraph 78.  To the extent these allegations must be admitted or denied, they are denied.  Pallas otherwise denies the allegations contained in paragraph 78.

79.     Pallas denies the allegations in paragraph 79, except that Pallas admits: (i) that certain preliminary drafts were circulated to CMS' subsidiaries; (ii) that Pallas was

one of approximately 100 people who were sent a preliminary draft of a portion of the 2000 Form 10-K on or about February 5, 2001; and (iii) that Pallas received a draft of the 2001 Form 10-K. Pallas specifically denies that she received drafts of any 10Qs. Pallas is without knowledge or information sufficient to admit or deny the allegations with respect to Hopper. To the extent these allegations must be admitted or denied, they are denied.

80.    Pallas denies the allegations in paragraph 80. Specifically, Pallas denies: (i) she had the opportunity or ability to change the disclosures of which the SEC complains in the first sentence of paragraph 80; (ii) that the filings containing revenues or volumes attributable to the energy trades at issue in this dispute were false, misleading, or contained misinformation; (iii) that she drafted, revised, approved or in any way was involved in the formulation of each public filing made by CMS; and (iv) that it was her responsibility to draft, verify, or approve filings made by CMS. Pallas is without knowledge or information sufficient to admit or deny the allegations with respect to Hopper. To the extent these allegations must be admitted or denied, they are denied

81.    Pallas denies the allegations in paragraph 81 except that Pallas admits that the quarterly earnings releases during the relevant time period which were prepared by others contained some discussion of CMS' gross revenues, and that the reported gross revenue did increase from $6 billion to $15 billion from the second quarter 2000 earnings release to the third quarter 2001 earnings release.

82.    Pallas denies the allegations in paragraph 82, except that Pallas admits that CMS attributed the increase of MS&T's revenues to "lower margin" as opposed to "no margin" energy marketing and trading.

83.    Pallas admits the allegations in paragraph 83.

84.    Pallas denies the allegations in paragraph 84, except that Pallas admits: (i) that the energy trades as described and defined in the SEC's First Amended Complaint are "no margin" trades; and (ii) that the phrase "lower-margin" appeared in some, but not all, of the quarterly earnings releases in the period described.    Pallas is without knowledge or information sufficient to admit or deny the allegations with respect to Hopper.  To the extent such allegations must be admitted or denied, they are denied.

85.    Pallas denies the allegations in paragraph 85, except that Pallas admits (i) the fourth quarter earnings release stated "gigawatt-hours of electricity marketed was up 919 percent in 2000 from 1999"; and (ii) the fourth quarter earnings release did not specifically address the energy trades at issue in this dispute or volumes directly attributable to those trades.

86.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 86.  To the extent the allegations must be admitted or denied, they are denied.

87.    Pallas denies as inaccurate and ambiguous the allegations in paragraph 87. Pallas specifically denies that she had the ability or authority to draft or revise the language of the earnings releases.  The allegations in the last sentence of paragraph 87 are legal conclusions which cannot be admitted or denied.  To the extent that such allegations must be admitted or denied, they are denied.

88.    Pallas denies the allegations in paragraph 88, except that Pallas admits: (i) that CMS investor presentations and quarterly earnings web-cast conference calls sometimes involved discussions of MS&T.  Pallas is without knowledge or information

sufficient to admit or deny the allegations with respect to whether the energy trades at issue in this dispute were or were not identified as the source of such growth. To the extent such allegations must be admitted or denied, they are denied.

89.    Pallas denies the allegations of paragraph 89, except that Pallas admits that the language block quoted by the SEC in paragraph 89 beginning with "We've seen tremendous growth…" was from a May 2, 2001 CMS web-cast with William McCormick as the moderator. Pallas is without knowledge or information sufficient to admit or deny what slides or presentations were being reflected during the first quarter 2001 earnings web-cast. To the extent that allegations regarding the slides shown during the web-cast must be admitted or denied, such allegations are denied. Pallas is without knowledge or information sufficient to admit or deny the allegations in the last five sentences of paragraph 89. To the extent such allegations must be admitted or denied, they are denied.

90.    Pallas denies the allegations in paragraph 90.

91.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 91. To the extent the allegations must be admitted or denied, they are denied.

92.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 92. To the extent the allegations must be admitted or denied, they are denied

93.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 93. To the extent the allegations must be admitted or denied, they are denied.

94.    Pallas admits CMS stopped accounting for the energy trades at issue in this dispute on a gross basis after Anderson reversed its earlier advice, but denies that CMS was "instructed" to do so.   Pallas also specifically denies the last sentence of paragraph 94 as ambiguous.   Pallas is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 94.   To the extent the allegations must be admitted or denied, they are denied.

95.    Pallas denies the allegations in paragraph 95, except that Pallas admits: (i) in 2001 she received a bonus which consisted of a check in the amount of $230,000 and CMS stock purchase plan options in the amount of $115,000; (ii) in 2000 she received a salary of $345,000; (iii) in 2001 her salary was increased to $363,000; and (iv) in 2002 she received a bonus in the amount of $726,000.   Pallas specifically denies she obtained any compensation or stock options by reason of the energy trades at issue in this dispute. Pallas is without knowledge or information sufficient to admit or deny whether she was the second highest paid CMS executive or employee in 2001.   To the extent this allegations must be admitted or denied, it is denied.

96.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 96.   To the extent the allegations must be admitted or denied, they are denied.

97.    Pallas denies the allegations in paragraph 97, except that Pallas admits CMS filed a 10-K reclassifying $4.2 billion in revenue and expenses for 2001 in late March 2002.  Pallas specifically denies that the energy trades at issue in this dispute had been improperly accounted for before the reclassification.  Pallas is without knowledge or

information sufficient to admit or deny the allegations regarding CMS' stock price. To the extent such allegations must be admitted or denied, they are denied.

98.     Pallas denies the allegations in paragraph 98. In particular, Pallas specifically denies that she did not suggest any changes to the footnote disclosure as that falsely implies that she had the opportunity, ability or authority to determine what would be disclosed with respect to the reclassification. Pallas also specifically denies the second sentence of paragraph 98 as ambiguous. Pallas is without knowledge or information sufficient to admit or deny the allegations in the first and fourth sentences of paragraph 98. To the extent these allegations must be admitted or denied, they are denied.

99.     Pallas denies the allegations in paragraph 99, except that Pallas admits: (i) on May 10, 2002 CMS issued a news release  announcing that an informal inquiry by the SEC had been made regarding "simultaneous purchases and sales of electricity with the same counterparties at the same price;" and (ii) on May 15, 2002 CMS issued another news release regarding the energy trades at issue in this dispute which included revenue and volume information. Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 99 regarding the stock prices. To the extent these allegations must be admitted or denied, they are denied.

100.     Pallas denies the allegations in paragraph 100, except that she admits she received a $2 million severance upon resigning from MS&T. However, Pallas specifically denies: (i) that she was not lawfully and contractually entitled to the compensation she received when she left MS&T; (ii) that she "retreated to her office and watched the stock price plummet;" and (iii) that she exhibited any form of misconduct.

101.    Pallas is without knowledge or information sufficient to admit or deny the allegations in paragraph 101. To the extent these allegations must be admitted or denied, they are denied.

## ANSWER TO THE FIRST CLAIM FOR RELIEF

102.    In response to paragraph 102, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

103.    The allegations contained in paragraph 103 constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 103.

104.    The allegations contained in paragraph 104 constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 104.

105.    The allegations contained in paragraph 105 constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 105.

## ANSWER TO THE SECOND CLAIM FOR RELIEF

106.    In response to paragraph 106, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

107.    The allegations contained in paragraph 107 constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 107.

108.    The allegations contained in paragraph 108 constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 108.

109.     The allegations contained in paragraph 109 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 109.

## ANSWER TO THE THIRD CLAIM FOR RELIEF

110.     In response to paragraph 110, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

111.     The allegations contained in paragraph 111 constitute legal conclusions to which no response is required and/or pertain solely to Hopper.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 111.

112.     The allegations contained in paragraph 112 constitute legal conclusions to which no response is required and/or pertain solely to Hopper.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 112.

## ANSWER TO THE FOURTH CLAIM FOR RELIEF

113.     In response to paragraph 113, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

114.     The allegations contained in paragraph 114 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 114.

115.     The allegations contained in paragraph 115 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 115.

116.     The allegations contained in paragraph 116 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 116.

## ANSWER TO THE FIFTH CLAIM FOR RELIEF

117.     In response to paragraph 117, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

118.     The allegations contained in paragraph 118 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 118.

119.     The allegations contained in paragraph 119 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 119.

120.     The allegations contained in paragraph 120 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 120.

## ANSWER TO THE SIXTH CLAIM FOR RELIEF

121.     In response to paragraph 121, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

122.     The allegations contained in paragraph 122 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 122.

123.     The allegations contained in paragraph 123 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 123.

124.     The allegations contained in paragraph 124 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 124.

## ANSWER TO THE SEVENTH CLAIM FOR RELIEF

125.    In response to paragraph 125, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

126.    The allegations contained in paragraph 126 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 126.

127.    The allegations contained in paragraph 127 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 127.

128.    The allegations contained in paragraph 128 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 128.

## ANSWER TO THE EIGHTH CLAIM FOR RELIEF

129.    In response to paragraph 129, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

130.    The allegations contained in paragraph 130 constitute legal conclusions to which no response is required and/or pertain solely to Hopper and Woolley.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 130.

131.    The allegations contained in paragraph 131 constitute legal conclusions to which no response is required and/or pertain solely to Hopper and Woolley.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 131.

132.    The allegations contained in paragraph 132 constitute legal conclusions to which no response is required and/or pertain solely to Hopper and Woolley.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 132.

133.    The allegations contained in paragraph 133 constitute legal conclusions to which no response is required and/or pertain solely to Hopper and Woolley.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 133.

## ANSWER TO THE NINTH CLAIM FOR RELIEF

134.    In response to paragraph 134, Pallas incorporates by reference her answers and responses to paragraphs 1 to 101.

135.    The allegations contained in paragraph 135 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 135.

136.    The allegations contained in paragraph 136 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 136.

137.    The allegations contained in paragraph 137 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 137.

138.    The allegations contained in paragraph 138 constitute legal conclusions to which no response is required.  To the extent that a response thereto is required, Pallas denies the allegations contained in paragraph 138.

## REQUEST FOR RELIEF

139.     The allegations contained in the request for relief, including sub-paragraphs I through VII constitute legal conclusions to which no response is required. To the extent that a response thereto is required, Pallas denies the allegations contained therein.

## II.
## GENERAL DENIAL

A.     **FIRST DEFENSE**

140.     The SEC's First Amended Complaint fails to state a claim upon which relief can be granted.

B.     **SECOND DEFENSE**

141.     The Amended Complaint does not assert a claim against Pallas that would entitle the SEC to obtain the relief sought against Pallas.

C.     **THIRD DEFENSE**

142.     The SEC lacks jurisdiction or standing to assert claims based on the lawful energy trades and FERC-reported trading volumes at issue in this dispute.

D.     **FOURTH DEFENSE**

143.     The SEC's claims are barred in whole or in part by the cease-and-desist order entered into with CMS.

E.     **FIFTH DEFENSE**

144.     The SEC's claims are barred in whole or in part because Pallas, MS&T, RES, CMS and/or Reliant acted in good faith and in reliance upon representations of and information provided by third parties, including the work, conclusions and opinions of professionals and experts.

F.    **SIXTH DEFENSE**

145.    Pallas had no duty of disclosure under the circumstances alleged. Alternatively, Pallas and/or MST and RES fully disclosed to CMS and Reliant, respectively, all relevant material facts.

G.    **SEVENTH DEFENSE**

146.    The SEC's allegations which give rise to their claims are not pled with sufficient particularity as required under Rule 9(b) of the Federal Rules of Civil Procedure.

H.    **EIGHTH DEFENSE**

147.    Pallas expressly reserves the right to assert additional affirmative and other defenses based on the facts learned through discovery.

I.    **NINTH DEFENSE**

148.    Pallas hereby incorporates each of the affirmative defenses set forth in the Answer of Preston Hopper as if fully set forth herein.

**III.**
**JURY DEMAND**

149.    Tamela Pallas hereby demands a trial by jury.

WHEREFORE, Tamela Pallas respectfully requests that the Court deny the SEC's requests for relief and enter an order(s) dismissing the claims against Ms. Pallas, awarding Ms. Pallas the costs of this action, and granting such other and further relief as the Court shall deem just and proper.

Dated:  April 13, 2006

Respectfully submitted,


James G. Munisteri
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
(713) 276-5500 (telephone)
(713) 276-6064 (telecopy)

**Attorneys for
Defendant Tamela Pallas**